## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ROME DIVISION

OTR Engineered Solutions, Inc.,

        Plaintiff,

v.

BLACKSMITH OTR, LLC,

        Defendant.

Civil Action No. 4:24-cv-00186

**Jury Trial Demanded**

## ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIMS

Defendant Blacksmith OTR, LLC (hereinafter "Blacksmith" or "Defendant")
answers the Complaint [DE 1] as follows:

Blacksmith admits that OTR Engineered Solutions, Inc. (hereinafter "OTR")
purports to bring this action for declaratory and injunctive relief and to recover
damages against Blacksmith.

## INTRODUCTION

1.     Blacksmith admits the allegations contained in paragraph 1 of the
Complaint.

2.     Blacksmith admits the allegations contained in paragraph 2 of the
Complaint.

3.     Blacksmith admits the allegations contained in paragraph 3 of the
Complaint.

1

4.    Blacksmith admits that in a May 24, 2019, Intellectual Property Agreement (the "2019 IP Agreement"), Taylor purported to grant OTR a non-exclusive, irrevocable, and perpetual license to "make, have made, sell, offer for sale, use, distribute, import and otherwise exploit any products" practicing the intellectual property shown in certain patents and patent applications related to tire tread designs. Blacksmith further admits that Taylor purported to grant OTR a nonexclusive, irrevocable, and perpetual license to "reproduce, distribute, make derivative works of, use and otherwise exploit" that intellectual property. Blacksmith denies the remaining allegations contained in paragraph 4 of the Complaint.

5.    Blacksmith admits that, in March 2023, Blacksmith brought suit against OTR in this Court alleging, among other things, design patent infringement and that OTR had infringed four of Blacksmith's trademarks: "Stabilizer," "Lightning Bolt," "Wearmaster," and "Outrigger." Blacksmith denies the remaining allegations contained in paragraph 5 of the Complaint.

6.    Blacksmith admits that, in April 2024, OTR and Blacksmith executed a settlement agreement regarding the dispute referenced in paragraph 5 of the Complaint. Blacksmith admits that, as part of the consideration of the settlement, the parties entered into a Master Supply Agreement (the "2024 Supply Agreement"). Blacksmith denies the remaining allegations contained in paragraph 6 of the Complaint.

2

7.     Blacksmith admits that the 2024 Supply Agreement made Blacksmith the exclusive supplier to OTR for certain tires. Blacksmith further admits that the 2024 Supply Agreement included, *inter alia*, tires branded with Blacksmith's trademarks "Stabilizer," "Lightning Bolt," "Wearmaster," and "Outrigger." Blacksmith admits the allegations contained in Footnote 1. Blacksmith denies the allegations contained in paragraph 7 to the extent the allegations imply that the agreement 2024 Supply Agreement only applied to trademarks and not to products. Blacksmith denies the remaining allegations contained in paragraph 7 of the Complaint.

8.     Blacksmith admits that Blacksmith agreed to sell OTR the tires, which the 2024 Supply Agreement refers to as the "Products" that are "more specifically described in Schedule 2" of the Agreement. Blacksmith admits that Schedule 2, in turn, lists specific products by part number and description and includes the price at which Blacksmith agreed to sell those products to OTR. Blacksmith admits that Blacksmith's trademarks (e.g., "Outrigger") are listed as part of the descriptions in Schedule 2 to help identify the "Products". Blacksmith denies the remaining allegations contained in paragraph 8 of the Complaint.

9.     Blacksmith admits that Schedule 6 identified trademarks: "Stabilizer," "Lightning Bolt," "Wearmaster," and "Outrigger," as registered or pending registration in the United States, United Kingdom, European Union, or Canada.

Blacksmith further admits that OTR agreed that it would not manufacture, buy, or sell "Products" if doing so would infringe Blacksmith's trademarks identified in Schedule 6. Blacksmith denies the remaining allegations contained in paragraph 9 of the Complaint.

10.    Blacksmith admits that OTR can procure certain tires branded with Blacksmith's trademarks only from Blacksmith. Blacksmith denies the remaining allegations contained in paragraph 10 of the Complaint.

11.    Blacksmith admits that it sent a notice to the parties' mutual supplier Deestone Corporation Public Company Limited ("Deestone") providing a copy of the signed Supply Agreement. Blacksmith denies the allegations contained in paragraph 11 of the Complaint.

12.    Blacksmith admits that on or around June 20, 2024, Blacksmith sent a letter to OTR demanding that OTR cease and desist all actions that are in violation of the Supply Agreement and that OTR provide clarification to its suppliers that OTR is not permitted to manufacture or procure the "Product(s)" whether or not such "Product(s)" have Blacksmith trademarks placed thereon. Blacksmith denies the remaining allegations contained in paragraph 12 of the Complaint.

13.    Blacksmith admits the allegations contained in paragraph 13 of the Complaint.

14.    Blacksmith denies the allegations contained in paragraph 14 of the Complaint.

15.    Blacksmith denies the allegations contained in paragraph 15 of the Complaint.

16.    Blacksmith denies the allegations contained in paragraph 16 of the Complaint.

17.    Blacksmith denies the allegations contained in paragraph 17 of the Complaint.

18.    Blacksmith denies the allegations contained in paragraph 18 of the Complaint.

19.    Blacksmith is without information sufficient to form a belief as to the truth of the allegation contained in paragraph 19 of the Complaint that one of OTR's suppliers, Deestone, sells tires to OTR that use the same tire tread pattern as the "Outrigger" product sold by Blacksmith (the "Competing Tires") and therefore denies the allegation. Blacksmith denies the remaining allegations contained in Paragraph 19 of the Complaint.

20.    Blacksmith admits that Deestone has sought more information from Blacksmith and OTR about whether OTR can legally purchase the Competing Tires from Deestone. Blacksmith admits that Blacksmith has taken the position that Deestone cannot supply the tires covered by the 2024 Supply Agreement to OTR.

Blacksmith denies the remaining allegations contained in paragraph 20 of the Complaint.

21.     Blacksmith denies the allegations contained in paragraph 21 of the Complaint.

22.     Blacksmith admits that OTR purports to seek a declaratory judgment concerning the terms of the 2024 Supply Agreement and the 2019 IP Agreement, as well as a declaration that the tread design used on the Competing Tires is not subject to any intellectual-property protection. Blacksmith denies the remaining allegations contained in paragraph 22 of the Complaint.

23.     Blacksmith admits that OTR purports to seek an injunction and damages for Blacksmith's tortious interference with OTR's contractual and business relations with its suppliers. Blacksmith denies the remaining allegations contained in paragraph 23 of the Complaint.

## PARTIES, JURISDICTION AND VENUE

24.     Blacksmith admits the allegations contained in paragraph 24 of the Complaint.

25.     Blacksmith admits the allegations contained in paragraph 25 of the Complaint.

26.     Blacksmith admits the allegations contained in paragraph 26 of the Complaint.

27.     Blacksmith admits that complete diversity exists between the parties on the basis that OTR is a Georgia citizen, and Blacksmith's sole member Pomp's Tire Service, Inc. is a Wisconsin citizen. Blacksmith denies that the amount in controversy for OTR's Complaint exceeds $75,000.00. Blacksmith denies the remaining allegations contained in paragraph 27 of the Complaint.

28.     Blacksmith admits the allegations contained in paragraph 28 of the Complaint.

29.     Blacksmith admits the allegations contained in paragraph 29 of the Complaint.

30.     Blacksmith admits the allegations contained in paragraph 30 of the Complaint.

## FACTUAL ALLEGATIONS

### *The Trade Dress Allegedly Protecting the "Outrigger" Trend Design is Invalid*

31.     Blacksmith admits the allegations contained in paragraph 31 of the Complaint.

32.     Blacksmith admits the allegations contained in paragraph 32 of the Complaint.

33.     Blacksmith admits that the opinion cited at *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 101 Fed. R. Evid. Serv. 774 (E.D. Wash. 2016) speaks for

itself. Blacksmith denies the remaining allegations contained in paragraph 33 of the Complaint.

34.     Blacksmith admits that the Ninth Circuit Court of Appeals opinion cited at *OTR Wheel Eng'g, Inc. v. W. Worldwide Servs., Inc.*, 897 F.3d 1008, 1012 (9th Cir. 2018) speaks for itself. Blacksmith denies the remaining allegations contained in paragraph 34 of the Complaint.

35.     Blacksmith admits the allegations contained in paragraph 35 of the Complaint.

36.     Blacksmith denies the allegations contained in paragraph 36 of the Complaint.

37.     Blacksmith denies the allegations contained in paragraph 37 of the Complaint.

### The 2019 IP Agreement and OTR's Patent Rights

38.     Blacksmith admits the allegations contained in paragraph 38 of the Complaint.

39.     Blacksmith admits the allegations contained in paragraph 39 of the Complaint.

40.     Blacksmith admits the allegations contained in paragraph 40 of the Complaint.

41.    Blacksmith admits that Taylor granted Blacksmith rights in certain patents and trademarks. Blacksmith is without information sufficient to form a belief as to the truth of the allegations regarding the reasons why Taylor may have granted Blacksmith rights in certain patents and trademarks and therefore the denies the allegations. Blacksmith denies the remaining allegations contained in paragraph 41 of the Complaint.

42.    Blacksmith admits that Taylor assigned Blacksmith ownership of certain patents and patent applications, including the '323 Application, and certain trademarks. Blacksmith denies the remaining allegations contained in paragraph 42 of the Complaint.

43.    Blacksmith admits that Taylor and OTR executed the 2019 IP Agreement. Blacksmith is without information sufficient to for a belief as to the truth of the allegations contained in footnote 2 and therefore denies them. Blacksmith denies the remaining allegations contained in paragraph 43 of the Complaint.

44.    Blacksmith denies the allegations contained in paragraph 44 of the Complaint.

45.    The 2019 IP Agreement speaks for itself. Blacksmith denies the remaining allegations contained in paragraph 45 of the Complaint.

46.    Exhibit B to the 2019 IP Agreement speaks for itself. Blacksmith denies the remaining allegations contained in paragraph 46 of the Complaint.

9

47.    The 2019 IP Agreement speaks for itself. Blacksmith denies the remaining allegations contained in paragraph 47 of the Complaint.

48.    Blacksmith admits that, in February 2021, Taylor filed a divisional application in the '323 Application. Blacksmith admits that the divisional application (which pursued patent protection for selected subject matter from the '323 Application) was assigned serial number 29,769,105 (the "'105 Application"). Blacksmith admits that the '323 Application was the "parent" application and the '105 Application was the "child" application of the related '323 Application. Blacksmith denies the remaining allegations contained in paragraph 48 of the Complaint.

49.    Blacksmith admits the allegations contained in paragraph 49 of the Complaint.

50.    Blacksmith admits that in June 2022, the U.S. Patent and Trademark Office issued U.S. Design Patent No. D955,974 (the "'974 Patent") from the '105 Application (i.e., the divisional application based on the '323 Application). Blacksmith denies the remaining allegations contained paragraph 50 of the Complaint.

51.    Blacksmith denies the allegations contained in paragraph 51 of the Complaint.

52.    Blacksmith denies the allegations contained in paragraph 52 of the Complaint.

### *OTR and Blacksmith Execute the 2024 Supply Agreement*

53.    Blacksmith admits that in November 2023, Blacksmith filed suit against OTR in this Court and brought claims for trademark infringement in the product names "Stabilizer," "Lightning Bolt," "Wearmaster," and "Outrigger." Blacksmith admits that Blacksmith also brought claims for patent infringement of a separate patent. Blacksmith denies the remaining allegations contained in paragraph 53 of the Complaint.

54.    Blacksmith admits that OTR and Blacksmith believed that they had reached a resolution of their dispute in April 2024, and that as part of that resolution, OTR and Blacksmith executed the 2024 Supply Agreement. Blacksmith denies the remaining allegations contained in paragraph 54 of the Complaint.

55.    The 2024 Supply Agreement speaks for itself. Blacksmith denies the remaining allegations contained in paragraph 55 of the Complaint.

56.    Blacksmith denies the allegations contained in paragraph 56 of the Complaint.

57.    Blacksmith admits the allegations contained in paragraph 57 of the Complaint.

58.    Blacksmith admits the allegations contained in paragraph 58 of the Complaint.

59.    Blacksmith admits that Schedule 6 lists and identifies what is shown but denies the allegations contained in paragraph 59 of the Complaint to the extent that it implies that Schedule 6 excludes any material and therefore denies the remainder of the allegations contained in paragraph 59 of the Complaint.

60.    Blacksmith denies the allegations contained in paragraph 60 of the Complaint.

### *Blacksmith Erroneously Interprets the 2024 Supply Agreement*

Blacksmith denies that Blacksmith Erroneously Interprets the 2024 Supply Agreement as alleged in the section heading above paragraph 61 of the Complaint.

61.    Blacksmith admits the allegations contained in paragraph 61 of the Complaint.

62.    Blacksmith admits the allegations contained in paragraph 62 of the Complaint.

63.    Blacksmith admits that Blacksmith contends that OTR cannot manufacture or sell tires using the same tread design as those tires listed on Schedule 2, even if the tires OTR manufactures or sells do not use any of Blacksmith's

trademarks. Blacksmith denies the remaining allegations contained in paragraph 63 of the Complaint.

64.    Blacksmith denies the allegations contained in paragraph 64 of the Complaint.

65.    Blacksmith denies the allegations contained in paragraph 65 of the Complaint.

66.    Blacksmith admits that the 2024 Supply Agreement contains an integration clause, which states that the "Agreement, together with the Schedules and any other document referenced herein, constitute the entire agreement between the Parties regarding the subject matter hereof and supersede all prior agreements, understandings, negotiations, and discussions, whether oral or written." Blacksmith further admits that the 2024 Supply agreement provides the "framework under which [OTR] may elect to place Orders from [Blacksmith] under [the] Agreement." The 2024 Supply Agreement also defines "Parties" to mean OTR and Blacksmith. Blacksmith admits that the 2024 Supply Agreement relates to tires listed in Schedule 2. Blacksmith denies the remaining allegations contained in paragraph 66 of the Complaint.

67.    Blacksmith admits that the 2019 IP Agreement is a contract between OTR, Taylor, and F.B.T. Enterprises. Blacksmith admits that the 2019 IP Agreement does concern tread design as it granted OTR a non-exclusive, irrevocable, and

perpetual license to "make, have made, sell, offer for sale, use, distribute, import and otherwise exploit any products" practicing the intellectual property shown in certain patents and patent applications related to tire tread designs. Blacksmith admits that the subject matter of the 2019 IP Agreement is the assignment and license of certain patents and trademarks (from Frederick B. Taylor and F.B.T. Enterprises to OTR). Blacksmith denies the remaining allegations contained in paragraph 67 of the Complaint.

68.    Blacksmith denies the allegations contained in paragraph 68 of the Complaint.

69.    Blacksmith admits that the 2024 Supply Agreement limits OTR's right to manufacture, procure, and sell "Products" under the agreement and "to the extent such manufacture/procurement and sale would violate [Blacksmith]'s intellectual properties rights *(such rights as of the date of this Agreement are set forth in Schedule 6)*." (emphasis added). Blacksmith denies the remaining allegations contained in paragraph 69 of the Complaint.

70.    Blacksmith denies the allegations contained in paragraph 70 of the Complaint.

71.    Blacksmith admits that a clause includes "to the extent such manufacture/procurement and sale would violate [Blacksmith's] intellectual properties rights (such rights as of the date of this Agreement are set forth in

14

Schedule 6)". Blacksmith denies the remaining allegations contained in paragraph 71 of the Complaint.

72.    Blacksmith denies the allegations contained in paragraph 72 of the Complaint.

### *Blacksmith Interferes with OTR's Supplier Relationships*

Blacksmith denies that it interfered with OTR's Supplier Relationships as alleged in the heading above paragraph 73 of the Complaint.

73.    Blacksmith admits the allegations contained in paragraph 73 of the Complaint.

74.    Blacksmith admits the allegations contained in paragraph 74 of the Complaint.

75.    Blacksmith admits that the Competing Tires use the tread design that was the subject of the West Litigation. Blacksmith admits that the West Litigation invalidated U.S. Trademark Registration No. 4,220,169. Blacksmith denies the remaining allegations contained in paragraph 75 of the Complaint.

76.    Blacksmith is without information sufficient to form a belief as to the truth of allegations contained in paragraph 76 of the Complaint and therefore denies the allegations.

77.    Blacksmith is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 77 of the Complaint and therefore denies the allegations.

78.    Blacksmith is without information sufficient to form a belief as to the truth of the allegations contained in paragraph 78 of the Complaint and therefore denies the allegations.

79.    Blacksmith denies the allegations contained in paragraph 79 of the Complaint.

## COUNT I

### DECLARATORY JUDGMENT

80.    Blacksmith reallege and incorporate by reference as though fully set forth each answer in Paragraphs 1 through 79.

81.    Blacksmith denies the allegations contained in paragraph 81 of the Complaint.

82.    Blacksmith denies the allegations contained in paragraph 82 of the Complaint.

83.    Blacksmith denies the allegations contained in paragraph 83 of the Complaint.

84.     Blacksmith denies the allegations contained in paragraph 84 of the Complaint.

85.     Blacksmith denies the allegations contained in paragraph 85 of the Complaint.

86.     Blacksmith denies the allegations contained in paragraph 86 of the Complaint.

87.     Blacksmith denies the allegations contained in paragraph 87 of the Complaint.

88.     Blacksmith denies the allegations contained in paragraph 88 of the Complaint.

89.     Blacksmith denies the allegations contained in paragraph 89 of the Complaint.

90.     Blacksmith denies the allegations contained in paragraph 90 of the Complaint.

91.     Blacksmith denies the allegations contained in paragraph 91 of the Complaint.

92.     Blacksmith denies the allegations contained in paragraph 92 of the Complaint.

93.     Blacksmith denies the allegations contained in paragraph 93 of the Complaint.

## COUNT II

## TORTIOUS INTERFERENCE WITH CONTRACT

94.    Blacksmith reallege and incorporate by reference as though fully set forth each answer in Paragraphs 1 through 79.

95.    Blacksmith denies the allegations contained in paragraph 95 of the Complaint

96.    Blacksmith denies the allegations contained in paragraph 96 of the Complaint.

97.    Blacksmith denies the allegations contained in paragraph 97 of the Complaint.

98.    Blacksmith denies the allegations contained in paragraph 98 of the Complaint.

99.    Blacksmith denies the allegations contained in paragraph 99 of the Complaint.

100.    Blacksmith denies the allegations contained in paragraph 100 of the Complaint.

101.    Blacksmith denies the allegations contained in paragraph 101 of the Complaint.

## **COUNT III**

**TORTIOUS INTERFERENCE WITH BUSINESS RELATIONS**

102.   Blacksmith reallege and incorporate by reference as though fully set forth each answer in Paragraphs 1 through 79.

103.   Blacksmith denies the allegations contained in paragraph 103 of the Complaint.

104.   Blacksmith denies the allegations contained in paragraph 104 of the Complaint.

105.   Blacksmith denies the allegations contained in paragraph 105 of the Complaint.

106.   Blacksmith denies the allegations contained in paragraph 106 of the Complaint.

107.   Blacksmith denies the allegations contained in paragraph 107 of the Complaint.

108.   Blacksmith denies the allegations contained in paragraph 108 of the Complaint.

109.   Blacksmith denies the allegations contained in paragraph 109 of the Complaint.

## COUNT IV

### TEMPORARY RESTRAINING ORDER, PRELIMINARY INJUNCTION, and PERMANENT INJUNCTION

110.   Blacksmith reallege and incorporate by reference as though fully set forth each answer in Paragraphs 1 through 109.

111.   Blacksmith denies the allegations contained in paragraph 111 of the Complaint.

112.   Blacksmith denies the allegations contained in paragraph 112 of the Complaint.

113.   Blacksmith denies the allegations contained in paragraph 113 of the Complaint.

114.   Blacksmith denies the allegations contained in paragraph 114 of the Complaint.

115.   Blacksmith denies the allegations contained in paragraph 115 of the Complaint.

## COUNT V

### ATTORNEYS' FEES AND LITIGATION EXPENSES

116.   Blacksmith reallege and incorporate by reference as though fully set forth each answer in Paragraphs 1 through 109.

117.   Blacksmith denies the allegations contained in paragraph 117 of the Complaint.

118.   Blacksmith denies the allegations contained in paragraph 118 of the Complaint.

## **PRAYER FOR RELIEF**

Blacksmith incorporates by reference all preceding paragraphs of this Answer as if fully set forth herein.   Blacksmith denies any and all allegations that a Declaratory Judgment is appropriate, that Blacksmith has tortiously interfered with contract, tortiously interfered with business relations, that a temporary restraining order, a preliminary injunction, or a permanent injunction is appropriate, or that OTR should be awarded any attorneys' fees or litigation expenses as alleged in the Complaint. Blacksmith denies all allegations that Plaintiff is entitled to any relief requested in paragraphs a. through l. of the Complaint's Prayer for Relief, or any other relief. Blacksmith denies that Plaintiff has suffered any harm whatsoever, much less $75,000 to satisfy diversity jurisdiction.

Blacksmith prays that it be awarded its attorneys' fees and expenses incurred in defending against the allegations contained in the Complaint.

## **DEMAND FOR JURY TRIAL**

Blacksmith demands a trial by jury for all issues so triable.

## **AFFIRMATIVE DEFENSES**

Pursuant to Federal Rule of Civil Procedure 8(c), and without altering any applicable burdens of proof, Blacksmith asserts the following affirmative defenses to the Complaint and reserves its right to assert additional defenses:

### **First Defense**

Plaintiff's Complaint fails to state any claim upon which relief can be granted.

### **Second Defense**

Plaintiff's Complaint fails to plausibly allege an amount in controversy sufficient to satisfy Diversity Jurisdiction for purposes of its tortious interference causes of action, Counts II and III. While Plaintiff alleges that it "buys more than $75,000 worth of Competing Tires from Deestone per year", Complaint at ¶76, Plaintiff fails allege that it has lost even $1.00 in sales from Deestone and, indeed, suggests that it may be entitled to only "nominal damages". *Id*. at ¶¶101, 109.

### **Third Defense**

Plaintiff's claims, including its declaratory judgment and tortious interference claims are barred due to Plaintiff's unclean hands.

### **Fourth Defense**

Plaintiff's claims, including its declaratory judgment and tortious interference claims are barred due to Plaintiff's fraud.

## Fifth Defense

Plaintiff's claims, including its tortious interference claims are barred based on the equitable defense of justification.

## Sixth Defense

Plaintiff's claims, including its tortious interference claims are barred and/or preempted by the First Amendment to the United States Constitution including commercial speech and communication protection thereunder.

## Seventh Defense

Plaintiff's claims, including its Declaratory Judgment and tortious interference claims are barred based on judicial estoppel, including positions advanced by Plaintiff in the District Court and in the Ninth Circuit as part of the *West* litigation.

## Eight Defense

Plaintiff's claims, including its Declaratory Judgment and tortious interference claims are barred based on mistake of fact.

## Ninth Defense

Plaintiff's claims, including its Declaratory Judgment and tortious interference claims are barred based on lack of meeting of the minds.

### Tenth Defense

Plaintiff's claims, including its Declaratory Judgment and tortious interference claims are barred based on fraudulent inducement.

### Eleventh Defense

Plaintiff's claims, including its Declaratory Judgment and tortious interference claims are barred based on failure of conditions precedent.

### Twelfth Defense

Plaintiff's claims for tortious interference are barred because of successful mitigation.

### Thirteenth Defense

Plaintiff's claims for tortious interference are barred because of breach of contract.

## COUNTERCLAIMS

Defendant/Counter-Plaintiff, Blacksmith OTR, LLC ("Blacksmith") brings these Counterclaims against Plaintiff/Counter-Defendant OTR Engineered Solutions, Inc. f/k/a OTR Wheel Engineering, Inc. ("OTR"), seeking all applicable legal and equitable remedies including recover of damages including exemplary and treble damages, disgorgement of profits, reasonable litigation costs and attorneys' fees, and both preliminary and injunctive relief, and states as follows:

24

## THE PARTIES

1.    Blacksmith is a limited liability company formed under the laws of Georgia, with a principal place of business at 6 Riverside Industrial Park NE, Rome, Georgia, 30161-7301.

2.    OTR, is a corporation formed under the laws of Georgia, with a principal place of business at 195 Chatillon Road, Ste. 4, Rome, Georgia 30161. OTR Wheel Engineering, Inc. formally changed its corporate name to OTR Engineered Solutions, Inc. effective February 14, 2024.

3.    Upon information and belief, OTR may have reorganized itself into one or more related, affiliated, and/or successor entities.   As discovery proceeds, Blacksmith reserves the right to amend the pleadings to identify all proper defendants.

4.    OTR does business in the Northern District of Georgia and nationally in connection with the sale of tires and wheels.

5.    OTR conducts business in this District and Division at its corporate headquarters, located at 195 Chatillon Road, Ste. 4, Rome, Georgia 30161, which is a fixed physical location that it possesses and controls and where it has employees.

6.    OTR also does business nationally and internationally through one or more websites, including <https://www.otrwheel.com>, and through a national and international network of authorized dealers and retailers.

## JURISDICTION AND VENUE

7.    This is an action arising under the patent laws of the United States, including 35 U.S.C. §§ 271, 281, 283, 284, 285, and 289; and under the Lanham Act, 15 U.S.C. § 1121(a), *et seq*.

8.    Blacksmith also files this action seeking a declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, for a declaratory judgment concerning no license to use the patented designs addressed in OTR's Complaint, discussed further below.

9.    Blacksmith also files this action for breach of contract, fraud, unfair and deceptive trade practices, and unfair competition, as recited below.

10.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).  This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1367(a) as to those claims not within its original jurisdiction, based upon the principles of supplemental jurisdiction, as they are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

11.    This Court has personal jurisdiction over OTR. OTR's actions establish such minimum contacts that jurisdiction comports with the Georgia long-arm statute, O.C.G.A. § 9-10-91, and the United States Constitution.

12.    Upon information and belief, OTR has conducted and does conduct business within the State of Georgia and maintains a regular and established place of business in the Northern District of Georgia, including but not limited to its headquarters in Rome, Georgia.

13.    Upon information and belief, OTR, directly and/or through subsidiaries, intermediaries, affiliates, related entities, or others, ships, distributes, offers for sale, sells, and/or advertises (including through its web pages) its products and services (including those accused of reverse passing off) described herein within this District.

14.    OTR has purposefully and voluntarily placed one or more infringing products into the stream of commerce with the expectation that it will be purchased and used by consumers, including consumers in this District.

15.    Upon information and belief, OTR is asserting that it has an implied license and other rights to use Blacksmith's design patent, with such implied license and other rights being asserted in this District and based on conduct allegedly occurring in or affecting this District.

16.    Venue is proper in the Northern District of Georgia under 28 U.S.C. §§ 1391 and 1400(b) because OTR has a regular and established place of business in this District as described herein, OTR is a resident of this State, and a substantial part of the events or omissions giving rise to the claim occurred in this District.

17.    Jurisdiction and venue are further proper in the Northern District of Georgia Rome Division by virtue of the Parties' agreement in the subject settlement agreement that "[a]ny dispute relating to the subject matter of this [Settlement] Agreement must be brought in the United States District Court for the Northern District of Georgia…." And because OTR filing a separate Complaint in this Court against Blacksmith related to the same facts that give rise to this case.

## FACTUAL BACKGROUND

### The Intellectual Property Ownership and Rights

21.    The late Fred Taylor was an innovative businessman in Rome, Georgia who grew successful businesses supplying the tire and wheel industry.

22.    At one point during Mr. Taylor's lifetime, Blacksmith, OTR, and related predecessors and affiliates, including F.B.T. Enterprises, Inc. ("F.B.T.") and OTR, were affiliated due to Mr. Taylor's ownership interests in each entity.

23.    Mr. Taylor and his businesses developed a variety of different intellectual property rights, including patents and trademarks.

24.    Blacksmith was formed as a 50/50 joint venture between Mr. Taylor and a predecessor of Camso USA Inc. ("Camso").

25.    In or around August 2018, a dispute arose involving Mr. Taylor, F.B.T., OTR, Blacksmith, and Camso relating to ownership of various intellectual property, specifically related to OUTRIGGER, WEARMASTER, and STABILIZER, and

28

non-competition agreements amongst the parties. This dispute resulted in various lawsuits and arbitration proceedings being commenced by and amongst the parties.

26.    In or around May 2019, Mr. Taylor, F.B.T., OTR, Blacksmith, and Camso reached a settlement of the dispute culminating in a series of related agreements delineating ownership and licensing right of certain intellectual property amongst Blacksmith, OTR, F.B.T., and Camso ("2019 Settlement", which attached hereto as Exhibit 1).

24.    As part of the 2019 Settlement, Blacksmith was assigned ownership of the following trademarks: OUTRIGGER, STABILIZER, and WEARMASTER (collectively, the "Licensed Marks"), each of which is associated with a specific tire Product, including a unique tire tread and profile design for each, that is recognizable in the industry ("2019 Trademark Assignment" attached as Exhibit 2). Those rights are evidenced by certain trademark filings in the United States and foreign countries, including U.S. Trademark Registration Nos. 2288934, 2365742, 2640897, and 7262196. Copies of filings related to these trademarks are attached hereto as Exhibits 3-6. The Agreement also acknowledged Blacksmith's ownership of the molds and the right to use and license the use of the molds of the proprietary tire designs.

27.    As part of the 2019 Settlement, Blacksmith and OTR, with Mr. Taylor signing on behalf of both entities, entered a Trademark License Agreement concerning the Licensed Marks (the "TLA"), a worldwide trademark license in

which Blacksmith authorized OTR to use the Licensed Marks and the molds to make the Licensed Products manufactured and distributed under the Licensed Marks in exchange for a royalty payment.  A copy of this Trademark License Agreement is attached hereto as Exhibit 7.  Under the TLA, the Licensed Marks had to be used in connection with the correlating Licensed Product (and mold), ***as they are known in the industry***.  Ex. 7 at 8, Schedule 2, ¶ 1 (emphasis added).

28.    Contemporaneous with the 2019 Settlement, Mr. Taylor, F.B.T., and OTR, with Mr. Taylor signing on his own behalf and on behalf of F. B.T. and OTR, entered into an Intellectual Property Agreement (the "Intellectual Property Agreement").  A copy of this Intellectual Property Agreement is attached hereto as Exhibit 8.

29.    The Intellectual Property Agreement granted OTR with a non-exclusive, irrevocable, worldwide, perpetual, royalty-free, fully transferable and fully sub-licensable (through multiple tiers) right and license, in and to Shared AWP IP, which is defined as being "all Intellectual Property specifically listed on *Exhibit B* (attached hereto and incorporated herein by this reference) under the heading "Shared AWP IP," including, any listed registrations and applications for registration of such Intellectual Property."

30.    The two Patent Applications identified as the Shared AWP IP in Exhibit B of the Intellectual Property Agreement, U.S. Patent Application Number

15/637,137 and U.S. Patent Application Number 29/643,323, no longer exist as both applications have since become issued patents. OTR's rights to U.S. Patent Application Number 15/637,137 expired on or about September 29, 2020, and OTR's rights to U.S. Patent Application Number 29/643,323 expired on or about March 23, 2021.

31.    Even though Patent Number D913,910 (the "'910 Patent") resulted from the issuance of U.S. Patent Application Number 29/643,323, OTR has no rights in the '910 Patent.

32.    The Intellectual Property Agreement does not grant OTR any rights to any issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, or renewals of the Shared AWP IP.

33.    The '974 Patent claims priority to U.S. Patent Application Number 29/643,323, but was unsuccessful incorporating by reference the material disclosed by U.S. Patent Application Number 29/643,323. OTR has no rights in the '974 Patent.

34.    The Intellectual Property Agreement inured to the benefit of the parties and to their respective successors and assigns.

35.    Through a series of transactions, Blacksmith and OTR are no longer commonly owned businesses, and the companies no longer involve Mr. Taylor, who is now deceased. Indeed, the two companies are competitors.

36.    Through a separate series of transactions and agreements in or around March 2023, Blacksmith became the successor in interest and owner of all right, title and interest in and to a portfolio of U.S. design patents and foreign patents for various tread designs, as well as related trademarks, previously owned by Mr. Taylor and/or F.B.T. ("March 2023 Patent Assignment", attached as Exhibit 9). The assignment includes the right to seek remedies for any and all past, present, and future infringements.

37.    Mr. Taylor is the named inventor on Blacksmith's '910 Patent directed to a particular tire design that issued from U.S. Patent Application Number 29/643,323. A copy of the '910 Patent is attached hereto as Exhibit 10. One of the figures from the '910 Patent is depicted below:



38.    Through the March 2023 Agreement, Blacksmith became the owner of all right, title, and interest in and to the '910 Patent, including the right to seek remedies for any and all past, present, and future infringements.

39.     Mr. Taylor is the named inventor on Blacksmith's '974 Patent directed to a particular tire design that issued from U.S. Patent Application Number 29/769,105. A copy of the '974 Patent is attached hereto as Exhibit 11. One of the figures from the '974 Patent is depicted below:



40.     Through the March 2023 Agreement, Blacksmith became the owner of all right, title, and interest in and to the '974 Patent, including the right to seek remedies for any and all past, present, and future infringements.

41.     The Intellectual Property Agreement inures to the benefit of Blacksmith as the successor in interest to Mr. Taylor's intellectual property rights because it is "binding upon and shall inure to the benefit of the parties hereto and their respective successors and assigns" and "nothing herein shall preclude any party from assigning its rights, in whole or in part, under this Agreement."

42.     Through yet another series of transactions and agreements, Blacksmith became the owner of all right, title, and interest in and to the '404 Patent, including the right to seek remedies for any and all past, present, and future infringements.

33

43.     Mr. Taylor is the named inventor on Blacksmith's '404 Patent directed to a particular tire design.  A copy of the '404 Patent is attached hereto as Exhibit 12. One of the figures from the '404 Patent is depicted below:



44.     Blacksmith also owns trademark rights in the marks LIGHTNING and LIGHTNING BOLT (the "Unlicensed Marks") (collectively the Licensed Marks, the "Marks") for use in connection with tires, including U.S. Trademark Registration No. 5,525,159. Exhibit 13. The Unlicensed Marks are related to the particular tread design shown in the '404 Patent.

45.     Therefore, Blacksmith is the owner of all rights associated with the Marks, including those rights licensed to OTR under the Trademark License Agreement, and the Unlicensed Marks, the '404 Patent, the '910 Patent, and the '974 Patent.

46.     By virtue of decades of continuous use, all of Blacksmith's Marks have become synonymous with high quality products that enables consumers to confidentiality associate Blacksmith and its products with its Marks. Blacksmith,

including through its predecessors in interest, has built significant and valuable goodwill in its Marks.

47.    Blacksmith has expended substantial funds in development and protection of its Marks and the associated goodwill that now accompanies those Marks and the tires associated with the Marks.

**The Original Dispute**

48.    Pursuant to the Trademark License Agreement, Blacksmith granted OTR a license to advertise, sell, and distribute Licensed Products using the Licensed Marks.  In exchange, OTR agreed to make quarterly royalty payments to Blacksmith in the amount of three percent of Net Sales of those products, beginning after 2020, all as set forth and defined in the Trademark License Agreement. OTR was also obligated to provide quarterly royalty reports.

49.    As of early 2022, Blacksmith became aware that OTR had not paid any royalties or provided any Royalty Reports for 2021, as it had agreed under the Trademark License Agreement.  Through a series of communications in 2022, Blacksmith notified OTR of its concerns over OTR's breach of the Trademark License Agreement and afforded OTR various opportunities to cure the breach.

50.    OTR finally sent a payment purportedly for its 2021 sales to Blacksmith on or about October 2022; however, the payment appeared to fall far short of royalties Blacksmith believed that OTR owed in accordance with the Trademark

License Agreement. Blacksmith believed, and continues to believe, that OTR was underreporting its net sales of products sold under the Licensed Marks.

51.    On February 17, 2023, with OTR having failed to cure the breach, Blacksmith notified OTR that it was terminating the Trademark License Agreement. Shortly thereafter, OTR sent a payment for its 2022 sales to Blacksmith, which again, Blacksmith believed to fall far short of royalties owed for the relevant time period.

52.    Thereafter, OTR attempted to forestall the termination, claiming it had not been properly notified of any breach and that it had, in any event, cured the breach in a timely manner under the Trademark License Agreement.  OTR also provided reports of its alleged sales of products under the Licensed Marks, purportedly to back up its royalty payments.  OTR was adamant that it had reported all sales and paid the full royalty.

53.    Concerned that OTR was not providing accurate information concerning its sales, Blacksmith repeatedly asked for backup information and even requested an audit.  OTR insisted it had reported all sales from all of its suppliers and assured Blacksmith it was not in breach of the Trademark License Agreement because all sales had been reported and all royalties had been paid.

54.    In an effort to independently verify OTR's representations, Blacksmith contacted OTR's manufacturers, who notably use molds belonging to Blacksmith to produce the products being supplied to OTR. The manufacturers confirmed

Blacksmith's suspicion that OTR's purchase of products covered by the Trademark License Agreement from OTR's manufacturers were substantially greater than the quantity of products that OTR had previously provided in its royalty reports.

55.     Upon information and belief, OTR hid, concealed, and failed to pay royalties on a substantial volume of sales that were subject to the Trademark License Agreement.

56.     Upon information and belief, OTR hid, concealed, and failed to pay royalties on *any* foreign sales of products bearing the Licensed Marks, despite the Trademark License Agreement being worldwide in scope.

57.     Upon information and belief, OTR withheld and failed to report information and royalties concerning its sales, despite repeated and specific requests from Blacksmith and written assurances by OTR that all had been reported and paid.

58.     Upon information and belief, OTR intentionally deceived Blacksmith about its sales and royalties in order to stave off litigation, prevent termination of the Trademark License Agreement, and stall Blacksmith's efforts to protect and enjoy its intellectual property rights.

59.     As of February 17, 2023, OTR had not reported all sales covered by the Trademark License Agreement.

60.     As of February 17, 2023, OTR had failed to pay all royalties for sales covered by the Trademark License Agreement.

61. As of February 17, 2023, OTR was in breach of the Trademark License Agreement.

62. Under the Trademark License Agreement, OTR was afforded 90 days to cure its breach.

63. As of May 19, 2023, OTR had not reported all sales covered by the Trademark License Agreement.

64. As of May 19, 2023, OTR had failed to pay all royalties for sales covered by the Trademark License Agreement.

65. As of May 19, 2023, OTR had breached of the Trademark License Agreement and failed to timely cure that breach.

66. OTR also continued to use the Licensed Marks in commerce in connection with the sale, offer for sale, and advertising of tires, including at least as shown on its websites, <https://www.otrwheel.com/tires>, (Exhibit 14); <https://www.otrb2b.com/tires-construction>, (Exhibit 15).

67. At the same time Blacksmith was requesting accurate information from OTR about its sales under the Trademark License Agreement, Blacksmith also became aware that OTR was advertising and selling tires that appeared to be covered by other intellectual property rights owned by Blacksmith, but without Blacksmith's permission.

68.    By way of example only, Blacksmith learned that OTR was selling products that infringed upon the '404 Patent (the "'404 Accused Products"), including those OTR labeled as "LIGHTNING."

69.    When Blacksmith asked whether OTR had any license to sell the '404 Accused Products, OTR was unable to produce any written agreement, saying instead it needed to "investigate" the issue.

70.    OTR conceded that it has sold products covered by the '404 Patent.

71.    Almost two months later, OTR responded, further conceding that it had no written license agreement to use the '404 Patent.

72.    OTR proposed various reasons why it could use the '404 Patent without Blacksmith's permission.  OTR claimed, for example, that one of its "affiliates" acquired rights to use the '404 Patent through separate transactions.  When it offered this explanation, however, OTR refused to provide documents concerning the transactions.  Even when it did provide documents later, OTR heavily redacted them.  As Blacksmith later discovered, those redacted portions flatly contradicted OTR's claim to have acquired rights to use the '404 Patent.

73.    Unable to rely on these transactions giving it rights, OTR also claimed it had an "implied license" to use the '404 Patent and that Blacksmith is "equitably estopped" from asserting infringement.  OTR provided virtually no evidence to corroborate these claims, and what evidence it provided was legally insufficient.

74.    Blacksmith further determined that other products apparently covered by its intellectual property appeared on OTR's website.  For example, Blacksmith further discovered that OTR was advertising or otherwise offering for sell products under Blacksmith's LIGHTNING BOLT trademark, including at least as shown on its website, <https://www.otrb2b.com/tires-construction>. *See* Exhibit 15.  While OTR denied current sales or plans to continue selling these products, it has not responded to Blacksmith's requests concerning past sales.

75.    Given OTR's unwillingness to provide this information, its misrepresentations concerning the alleged transactions that provided it rights to use the '404 Patent, and its apparent withholding of information concerning its sales under the Trademark License Agreement, Blacksmith has every reason to believe additional misuse of its intellectual property has occurred.

### The Settlement

76.    On November 27, 2023, Blacksmith filed the original complaint in this Court captioned *Blacksmith OTR, LLC v. OTR Wheel Engineering, Inc.*[1], Civil Action No. 4:23-cv-00279-WMR ("Original Action") alleging that, *inter alia*, OTR had breached the TLA for failing to remit the full royalties owed under the

---

[1] After the filing of the Complaint in the Original Action, on or about February 14, 2024, OTR Wheel Engineering, Inc. changed its corporate name to OTR Engineered Solutions, Inc.

agreement; infringed Blacksmith's Marks OUTRIGGER, STABILIZER, WEARMASTER, LIGHTNING, and LIGHTNING BOLT; and infringed the '404 Patent.

77.    Blacksmith desired, and Blacksmith believed OTR desired, to fully and finally resolve the disputes between the Parties, and as such spent several months negotiating a settlement agreement wherein Blacksmith would accept a significantly discounted amount for the past-due royalty payments owed by OTR under the TLA, and potential infringement damages from OTR's unauthorized use of the '404 Design Patent, in exchange for a supply agreement in which OTR would exclusively purchase certain specified tires from Blacksmith.

78.    On or about April 12, 2024, Blacksmith and OTR signed a Settlement Agreement ("Settlement Agreement"), which included as part of the Settlement Agreement a Supply Agreement as Exhibit A ("Supply Agreement") and a Design Patent License Agreement as Exhibit B ("Design Patent License Agreement") to resolve the claims in the Original Action. A copy of the complete Settlement Agreement, together with its exhibits, is attached hereto as Exhibit 16.

79.    The Supply Agreement made Blacksmith the exclusive supplier to OTR of certain tires (whether as loose tires or as part of an assembly) specifically identified in Schedule 2 of the Supply Agreement ("Products"). *Id*. at p. 11, §1.1. Schedule 2 lists specific Products by part number and description, in accordance

with industry standard used by tire manufacturers, suppliers, and sellers of incorporating product names to describe the underlying products with tire shapes, sizes, appearances, tire profile, and tread design intended to be covered by the Products, and includes the price at which Blacksmith agreed to sell those Products to OTR. *Id*. at p. 24.

80.    During the negotiation, Blacksmith insisted upon the Supply Agreement as part of the Settlement Agreement, as opposed to a trademark license, because of OTR's history of underreported its sales to avoid paying royalties under the TLA. The Supply Agreement was Blacksmith's way of maintaining accurate accounting of how many Products OTR was selling.

81.    The Supply Agreement made Blacksmith the exclusive supplier to OTR of certain tires (whether as loose tires or as part of an assembly) specifically identified in Schedule 2 of the Supply Agreement ("Products"). *Id*. at p. 11, §1.1. Schedule 2 lists specific Products by part number and description, in accordance with industry standard used by tire manufacturers, suppliers, and sellers of incorporating product names to describe the underlying products with tire shapes, sizes, appearances, tire profile, and tread design intended to be covered by the Products, and includes the price at which Blacksmith agreed to sell those Products to OTR. *Id*. at p. 24.

82.    Under the Supply Agreement, OTR was not required to purchase Blacksmith's Products, but OTR agreed not to "manufacture/procure and sell" the Products, defined as the tire products described in Schedule 2, from anyone other than Blacksmith. *Id*. at p.11, §1.1.

83.    The Supply Agreement granted OTR a non-exclusive, non-transferable license to the trademark registrations set forth on Schedule 6 of the Supply Agreement, but the Supply Agreement was not limited to a license for trademarks and was, in fact, an agreement to supply Products as provided by Schedule 2 of the Supply Agreement. The trademark license provision was simply in furtherance and support of the Supply Agreement to allow OTR to promote and advertise the Products using Blacksmith's Marks. Schedule 6 also did not purport to list all of Blacksmith's intellectual property, but only the trademarks that Blacksmith was agreeing to license under the terms of Section 14 of the Supply Agreement.

84.    Notably, Section 14.2 of the Supply Agreement references Blacksmith's trademark independent of the capitalized term "Product(s)." *Id.* at Ex. A, ¶ 14.2. Applying OTR's definition of "Product(s)" to only include the specifically identified tires *with* Blacksmith's trademarks applied, as argued by OTR, would render Section 14.2 of the Supply Agreement meaningless.

85.    Article 11 of the Settlement Agreement provides that the Settlement Agreement contains a partial merger clause. The Settlement Agreement and the

Exhibits thereto formed the entire agreement and understanding between Blacksmith and OTR. The "TLA" is defined by the Settlement Agreement as the Trademark License Agreement.

86.    Article 22 of the Supply Agreement contains a partial merger clause.

87.    While OTR was not obligated to purchase the Products listed in Schedule 2, Blacksmith entered into the Settlement Agreement on the good faith belief that OTR would not "manufacture/procure and sell the Products," i.e. the specific tires listed in Schedule 2 of the Supply Agreement, and that OTR could only purchase the Products from Blacksmith.

88.    Blacksmith would not have entered into the Settlement Agreement but for its reliance that OTR would abide by the terms of the Supply Agreement to not "manufacture/procure and sell the Products." (Emphasis added).

89.    On April 16, 2024, the Parties jointly filed a Notice of Settlement in the Original Action notifying the Court that the Parties had reached a Settlement Agreement, executed the settlement agreement, and were in the process of performing under that agreement ("Notice of Settlement"). The Parties committed to submitting a stipulation of dismissal with prejudice "upon completion of the settlement."

90.    That same day, on April 16, 2024, the Court directed the Clerk of Court to administratively close the Original Action, and further directed the Parties to file

a dismissal, but noted: "If settlement negotiations fail, the parties shall promptly move to reopen the case." ("April 16, 2024, Order").

91.    Pursuant to the Court's April 16, 2024, Order, the Parties filed a joint stipulation of dismissal on April 19, 2024.

92.    On May 3, 2024, Blacksmith sent an email to Deestone Corporation Public Company Limited, which OTR previously used to manufacture/procure the Products stating: "Please find attached a signed Supply Agreement between Blacksmith OTR and OTR Wheel Engineered Solutions Inc. This agreement fundamentally changes how OTR Wheel Engineered Solutions Inc. can purchase Blacksmith OTR LLC's trademarked products. Going forward, OTR will purchase all Outrigger, Wearmaster and Stabilizer through Blacksmith OTR LLC. This includes any product that utilizes our Blacksmith design. [Deestone] should immediately refrain from taking any direct orders from OTR Wheel Solutions for these products. We have also signed a License Agreement by which OTR Wheel Engineered Solutions can still purchase the Lightning design product directly from Deestone. Note that this includes all products that utilize the Lightning design regardless of how product is branded (Liftboss etc.)." A copy of the email exchange is attached hereto as Exhibit 17.

**The Breakdown of the Settlement**

93.    In May and June 2024, OTR and Blacksmith exchanged a series of emails regarding OTR's request to clarify the purpose and scope of the Supply Agreement. It became clear to Blacksmith through these communications that OTR was interpreting the term "Products" in the Supply Agreement differently than Blacksmith. In May and June 2024, Blacksmith and OTR exchanged a series of emails working through the Parties' compliance under the Settlement Agreement, as referenced in the Notice of Settlement to the Court. Around that time, the Parties began to realize that they were not in agreement as to the material terms of the Settlement Agreement—specifically, whether the 'Master Supply Agreement' was indeed a *supply* agreement, or whether, as OTR now submits, it was merely a trademark license, such that OTR could purchase "Product" from a supplier other than Blacksmith so long as it did not include Blacksmith's trademarks.  A copy of the email exchange is attached hereto as Exhibit 18.

94.    On or about May 30, 2024, OTR sent an email to Blacksmith stating: "We are getting questions from our suppliers (specifically Deestone) on what they can and cannot sell to us. I thought it would be a good idea if we put together a joint email outlining our arrangement/agreement that would give suppliers comfort in what they can/cannot sell to OTR. Can you please review the below and let me know if you have any comments/changes. Once reviewed/finalized, could we send

together to Deestone to clear up any confusion?" *See* Exhibit 18 at p. 7, with

Blacksmith revisions in bold and blue ink.

95.    In the May 30, 2024 email, OTR proposed the following:

Outrigger, Wearmaster, Stabilizer Trademarks (words) Lightning
Patent (tread pattern design)

Tread Pattern
- OTR can purchase the "404" Lightning Tread tires from
  suppliers for JCB sales only – US Design Patent No.
  D893,404
- Any other purchases must be from BOTR via the Supply
  Agreement between OTR and BOTR

Trademark
- Tires with the word "Outrigger"
- OTR can only purchase from suppliers for sales to China
  customers
- POs issued by OTR's China legal entity
- All other purchases must be made from BOTR via the
  Supply Agreement between OTR and BOTR
- Tires with the word "Wearmaster"
- All purchases must be made from BOTR via the Supply
  Agreement between OTR and BOTR
- Tires with the word "Stabilizer"
- All purchases must be made from BOTR via the Supply
  Agreement between OTR and BOTR

96.    On or about June 4, 2024, Blacksmith responded with an email to OTR

revising the language of the May 30, 2024 email to clarify what was to be

communicated to suppliers should include tires utilizing the words "Outrigger",

"Wearmaster", and "Stabilizer" but also tires "utilizing the Tread Pattern design of

the Outrigger", "Utilizing the Tread Pattern design of the Wearmaster", and "utilizing the Tread Pattern design of the Stabilizer."

97.    On or about June 5, 2024, OTR responded stating, "Could you provide a little more detail about the tread patterns? I want to make it clear to Deestone exactly what we are talking about. For Outrigger, is it the tread pattern with US Trademark 4,220,169? Is there another Trademark or Patent associated with the tread pattern. I don't know the trademark or patent numbers for the Wearmaster or Stabilizer tread patterns because they aren't 'titled' as such in any documents I have. Can you specify the patent or trademark numbers for the tread patterns you are thinking of? I asked around here and we were using the WEARMASTER name on a few different tread patterns, same with STABILIZER. I want to make sure we understand what you are referring to."

98.    On or about June 5, 2024, Blacksmith responded: "I am referring to those products where Blacksmith has a trademark as laid out in Schedule 6 of the Supply Agreement between OTR and Blacksmith. I am also including a file with details on design patents and trademarks that provides more detail. *We do need to ensure that Deestone does not simply replate a trademarked design and thereby undermines the intent of the Supply Agreement.*" (Emphasis added).

99.    On or about June 12, 2024, OTR sent an email to Blacksmith disputing Blacksmith's understanding that OTR was required to purchase the Products as

defined by the Supply Agreement from Blacksmith by stating, "[t]he Settlement Agreement and resulting Supply and License Agreements were related to the Outrigger, Wearmaster and Stabilizer **names** (not tread designs). The only tread pattern involved was the '404 – lightning. There is an Intellectual Property Agreement, Dated May 24, 2019 (see attached) that grants OTR an irrevocable, worldwide, perpetual, royalty-free license to the 'Shared AWP IP'. The shared AWP IP includes, among others, patent application # 29/643,323 (attached)."

100.   OTR's interpretation, as expressed in its June 12, 2024, email, entirely ignores Article 11 of the Settlement Agreement and Article 22 of the Supply Agreement, namely the Settlement Agreement and its exhibits, including specifically the Supply Agreement, supersede *all prior agreements*.

101.   For the first time, OTR informed Blacksmith of its plan "make/procure and sell" the same "Products" but merely removing Blacksmith's trademarks, in contravention of the Settlement Agreement and the Supply Agreement.

102.   OTR's June 12, 2024, email further stated: "Tires formerly labeled 'Stabilizer' by OTR used the below tread pattern, which is either covered by a licensed patent or has no patent or trademark protection. In either event OTR will continue to manufacture this tire, but will not put the word Stabilizer on it per the Settlement Agreement."

103.  The June 12, 2024, email further stated: "Tires formerly labeled 'Wearmaster' by OTR used the below tread pattern, which has no patent or trademark protection. The designs are open for anyone to use. OTR will continue to manufacture this tire, but will not put the word Wearmaster on them per the Settlement Agreement."

104.  Because the June 12, 2024, email from OTR did not comport with Blacksmith's understanding that OTR "may not manufacture/procure and sell Product(s)", as specifically described by Schedule 2 of the Supply Agreement from Blacksmith, except as supplied by Blacksmith, Blacksmith sent a notice to OTR on or about June 20, 2024 to "cease and desist all actions that are in violation of the Supply Agreement and to provide clarification to its suppliers that OTR is not permitted to manufacture or procure the 'Product(s)' as listed by Schedule 2 of the Supply Agreement, whether or not such 'Product(s)' have Blacksmith trademarks placed thereon and irrespective of the terms of the Intellectual Property Agreement dated May 24, 2019."

105.  At that time, Blacksmith was not aware that OTR was indeed "manufactur[ing]/procur[ing]" Product(s), and furthermore, at that time, Blacksmith was not aware that all throughout the negotiation of the Settlement Agreement, it was OTR's intention to "manufacture/procure and sell" the Product(s) with

Blacksmith's Marks removed, infringing upon the goodwill that Blacksmith has developed for many years between the Products and the Marks.

106.  On July 31, 2024, the Parties conducted a phone call through their respective counsel during which counsel for OTR informed counsel for Blacksmith that OTR had no plans to place any orders for Products from Blacksmith under the Supply Agreement and was unwilling to state whether it *ever* had plans to place any orders.

107.  That same day on July 31, 2024, OTR filed the instant declaratory judgment action in this same Court captioned *OTR Engineered Solutions, Inc. v. Blacksmith OTR, LLC*, Civil Action No. 4:24-cv-00186-WMR ("DJ Complaint") alleging that "Blacksmith's interpretation of the 2024 Supply Agreement is wrong." In the DJ Complaint, OTR further asserted affirmative claims of tortious inference with contract and tortious interference with business relations.

108.  Blacksmith, in good faith, relied upon OTR's commitment to exclusively purchase the Products as outlined in the Supply Agreement as a significant part of the consideration for the Settlement Agreement. While OTR was not obligated to purchase the Products, it certainly was not permitted to "make/procure" the same identical Products and simply remove Blacksmith's trademarks ("Infringing Products") to avoid paying Blacksmith and diminishing the value of Blacksmith's trademarks.

109.    After Blacksmith learned that OTR had no plans to order Products from Blacksmith, but instead planned to procure Infringing Products, Blacksmith discovered that OTR had actually launched the Infringing Product that is identical to Blacksmith's Outrigger Product at a trade show in February 2024—two months before the Settlement Agreement and Supply Agreement were executed.  In other words, while this case was pending, while the Parties were negotiating the Settlement Agreement and Supply Agreement, and several weeks before the agreements were executed on April 12, 2024, OTR had already made arrangements to "manufacture/procure and sell" the "Product(s)" without Blacksmith's trademarks (and without Blacksmith's knowledge) (attached hereto as Exhibits 19, 20):





110.  OTR is placing orders from Deestone for Blacksmith Products as defined by the Supply Agreement rather than placing such orders with Blacksmith as required by the conditions of the Settlement Agreement.

111.  OTR is using the mold for Blacksmith Products to manufacture Infringing Products, but covering up, removing, or otherwise replating Blacksmith's Marks such that the Infringing Products are in fact Blacksmith Products. OTR was only authorized to use the molds for Blacksmith Products pursuant to the TLA, which is now superseded by the Settlement Agreement and the Supply Agreement.

112.  Blacksmith recently obtained an OTR Infringing Product. Upon inspection, the Mold ID stamped on the OTR Infringing Product indicated that the mold used to manufacturing the OTR Infringing Product was manufactured in 2023—the year prior to the execution of the Settlement Agreement.



113.    The tread dimensions and depth of the OTR Infringing Product is the same as the Blacksmith Outrigger Product based on initial caliper measurements.

114.    The uninflated diameters are the same between the OTR Infringing Product and the Blacksmith Outrigger Product.

115.    The tits, or vents, are located in the exact same spots for the OTR Infringing Product and the Blacksmith Outrigger Product.

116.    The inner bladder of the OTR Infringing Product and the Blacksmith Outrigger Product appears to be exactly the same. When the tires are formed, the bladder is inflated (like a balloon), such that the tire is formed between the mold and the bladder, wherein the pattern on the bladder leaves its impression on the inside of the tire, and the pattern on the mold leaves its impression on the outside of the tire, forming its tread pattern.  Here, the texture (like a fingerprint) along with the sizing notation line up exactly as between the two tires.

117.    On information and belief, OTR never had any intent to purchase Products from Blacksmith, but rather intended to make/procure the Products

themselves and remove Blacksmith's trademarks from the Products, all while spending months negotiating with Blacksmith over the Supply Agreement, with which OTR never intended to comply.

118.    On information and belief, OTR is marketing and selling Blacksmith's Products under OTR's own brand without ordering such Products from Blacksmith to provide a false designation of origin and to mislead customers into thinking the tires are Blacksmith Products.

119.    On information and belief, OTR is engaging in express reverse passing off of Blacksmith's Products or implied reverse passing off of Blacksmith's Products damaging Blacksmith's goodwill and brand and allowing OTR to benefit from Blacksmith's efforts and costs to establish goodwill in the marketplace.

120.    Upon information and belief, OTR is telling, or has told, its distributors, customers, and other third parties that the Infringing Product is the Blacksmith Product (i.e., the "Outrigger").

121.    OTR, through its distributors or customers, is advertising the "OTR LIFTBOSS S/T OUTRIGGER R4" and further describes the "LIFTBOSS S/T (WAS OUTRIGGER)," (Attached as Exhibit 21):





122.    This is direct evidence of reverse passing-off—OTR is selling Blacksmith's Product ("Outrigger") as its own Infringing Product ("LiftBoss S/T").

123.    To the extent OTR argues that it is not reverse passing-off Blacksmith's Product as its own Infringing Product, then OTR is falsely advertising its Infringing Product as Blacksmith's Product using Blacksmith's Mark.

124.    On September 23, 2024, Blacksmith filed a Motion to Re-open the Original Action and concurrently filed a Motion to Dismiss this Action.

125.   The Court held a hearing on January 16, 2024, on Blacksmith's Motion to Re-Open the Original Action and its Motion to Dismiss this Action. The Court denied both motions without prejudice and set the deadline for Blacksmith to answer the DJ Complaint within fourteen (14) days.

## COUNT I – BREACH OF SETTLEMENT AGREEMENT

126.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

127.   On November 27, 2023, Blacksmith filed the Original Action alleging that, *inter alia*, OTR had breached the Trademark License Agreement for failing to remit the full royalties owed under the agreement; infringed Blacksmith's Licensed Marks, OUTRIGGER, STABILIZER, WEARMASTER, and Unlicensed Marks, LIGHTNING, and LIGHTNING BOLT trademarks; and infringed Blacksmith's '404 Patent.

128.   On April 12, 2024, Blacksmith and OTR signed a Settlement Agreement, which included as part of the settlement a Supply Agreement and a Design Patent License Agreement, to resolve Blacksmith's claims against OTR in the Original Action, including patent infringement, breach of the TLA, and trademark infringement.

129.   The Supply Agreement made Blacksmith the exclusive supplier to OTR the Products specifically identified in Schedule 2 of the Supply Agreement. OTR

agreed not to "manufacture/procure and sell" the Products meeting the description provided by Schedule 2 from anyone other than Blacksmith.

130.   Blacksmith gave valuable consideration for entering into the Settlement Agreement and Supply Agreement, as set forth therein, including significantly discounting the past-due royalties that OTR owed to Blacksmith under the prior Trademark License Agreement and dismissal of Blacksmith's claims against OTR including patent infringement, breach of the Trademark License Agreement, trademark infringement.

131.   Blacksmith and OTR mutually assented to all terms of the Settlement Agreement and the Supply Agreement.

132.   OTR breached the Settlement Agreement and the Supply Agreement.

133.   Even before the Parties executed the Settlement Agreement and Supply Agreement, OTR was procuring, and continued to procure, the Products from another supplier and not from Blacksmith, as required under the Supply Agreement.

134.   On information and belief, OTR never had any intent to purchase Products from Blacksmith, but rather intended to make/procure the Products itself and remove Blacksmith's trademarks from the Products.

135.   OTR has breached the Settlement Agreement and Supply Agreement in one or more ways, including by:

        a.  anticipatory repudiation;

58

b. failing to report Current Inventory on Hand and Products on Order and meeting reporting obligations and payment requirements pursuant to Section 1.4 of the Supply Agreement;

c. procuring the Products from another supplier and not from Blacksmith; and

d. such other conduct as Blacksmith shall investigate, discover, and prove at trial.

136. As a result of OTR's breach of the Settlement Agreement and Supply Agreement, Blacksmith has suffered damages in an amount to be determined at trial.

## <u>COUNT II –ACTUAL FRAUD</u>

137. Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

138. On April 12, 2024, Blacksmith and OTR signed, the Supply Agreement as part of the Settlement Agreement of the Original Action.

139. The Supply Agreement made Blacksmith the exclusive supplier to OTR the Products specifically identified in Schedule 2 of the Supply Agreement. OTR agreed not to "manufacture/procure and sell" the Products meeting the description provided by Schedule 2 from anyone other than Blacksmith.

140. Blacksmith insisted upon the Supply Agreement as part of the Settlement Agreement, as opposed to a trademark license, because of OTR's history

of underreported its sales to avoid paying royalties under the TLA. The Supply Agreement was Blacksmith's way of maintaining accurate accounting of how many Products OTR was selling.

141.  Under the Supply Agreement, OTR was not required to purchase Blacksmith's Products, but OTR agreed not to "manufacture/procure and sell" the Products, defined as the tire products described in Schedule 2, from anyone other than Blacksmith.

142.  While OTR was not obligated to purchase the Products listed in Schedule 2, Blacksmith entered into the Settlement Agreement on the good faith belief that OTR would not "manufacture/procure and sell the Products," i.e., the specific tires listed in Schedule 2 of the Supply Agreement, and that OTR could only purchase the Products from Blacksmith, regardless of whether the Products included Blacksmith's Marks.

143.  OTR promised in the Supply Agreement not to "manufacture/procure and sell the Products" with the present intention not to perform under this promise.

144.  The definition of the "Products" in the Supply Agreement thus referred to the "tires" identified in Schedule 2, whether or not those tires also included one or more of Blacksmith's Marks.

145.  Unbeknownst to Blacksmith, at the time OTR signed the Supply Agreement, OTR had already manufactured/procured the Infringing Product that is

identical to Blacksmith's Outrigger Product, using molds for Blacksmith's Outrigger Product by the same supplier as Blacksmith, but with Blacksmith's trademark removed, which it launched at a trade show in February 2024—two months before the Settlement Agreement and Supply Agreement were executed.

146.   On July 31, 2024, the Parties conducted a phone call through their respective counsel during which counsel for OTR informed counsel for Blacksmith that OTR had no plans to place any orders for Products from Blacksmith under the Supply Agreement and was unwilling to state whether it *ever* had plans to place any orders.

147.   That same day on July 31, 2024, OTR filed the instant declaratory judgment action in this same Court captioned *OTR Engineered Solutions, Inc. v. Blacksmith OTR, LLC*, Civil Action No. 4:24-cv-00186-WMR ("DJ Complaint") alleging that "Blacksmith's interpretation of the 2024 Supply Agreement is wrong."

148.   OTR continues to use the mold for Blacksmith Products to manufacture Infringing Products, but covering up, removing, or otherwise replating Blacksmith's Marks, including the OUTRIGGER trademark, such that the Infringing Products are in fact Blacksmith Products. OTR was only authorized to use the molds for Blacksmith Products pursuant to the TLA, which is now superseded by the Settlement Agreement and the Supply Agreement. OTR no longer has any authorization to use any molds of Blacksmith Products.

149.   Upon information and belief, OTR is telling, or has told, its distributors, customers, and other third parties that the Infringing Product is the Blacksmith Product (i.e., the "Outrigger").

150.   OTR, through its distributors or customers, is advertising the "OTR LIFTBOSS S/T OUTRIGGER R4" and further describes the "LIFTBOSS S/T (WAS OUTRIGGER)."

151.   Based on these facts, OTR promised not to make/procure and sell the Products from any source other than Blacksmith, with the present intent to make/procure the Products themselves and remove Blacksmith's trademarks from the Products. OTR's fraud and duplicitous purposeful and intentionally fraudulent conduct is further evidenced by the fact that OTR knows its conduct is unlawful in view of the successful positions OTR advanced in the *West* litigation.

152.   On information and belief, at the time the Supply Agreement was signed, OTR had already used a mold authorized under the dispute TLA caused to be manufactured at least some Infringing Product, i.e., "Product" under the Supply Agreement, which they did not report to Blacksmith pursuant to Section 1.4 of the Supply Agreement, relating to "Current Inventory on Hand" and "Products on Order," including its various sub-sections.

153.   Each of those respective inventories was supposed to be listed in Section 7 of the Supply Agreement, which, as per Section 22 ("Entire Agreement"),

constitutes part of the Agreement—"This Agreement, together with the Schedules…"

154. At the time the Supply Agreement was executed, it is believed that OTR had significantly more "Current Inventory on Hand" and "Products on Order" than was reported in Schedule 7, *i.e.*, any Infringing Product that been ordered or already received.

155. OTR defrauded Blacksmith by failing to report its Current Inventory on hand and/or Products on Order pursuant to Section 1.4 of the Agreement, and otherwise complying with the sub-sections of Section 1.4.

156. OTR misrepresented, or otherwise intentionally concealed, these material facts and its true intent to fraudulently induce Blacksmith to voluntarily dismiss its well-founded claims against OTR for its breach of the TLA, infringement of Blacksmith's trademarks, and infringement of Blacksmith's patent.

157. Blacksmith reasonably relied on OTR's promise and material representations in the Settlement Agreement and the Supply Agreement.

158. As a direct and proximate result of OTR's fraud, Blacksmith has suffered damages in an amount to be determined at trial.

## COUNT III – FEDERAL FALSE DESIGNATION OF ORIGIN AND UNFAIR COMPETITION

## (15 U.S.C. § 1125(a)(1)(A))

159.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

160.   Blacksmith and OTR compete in the market for AWP tires.

161.   Blacksmith is the owner of the Marks: OUTRIGGER, STABILIZER, and WEARMASTER, each of which is associated with a specific tire Product, including a unique tire tread and profile design for each, that is recognizable in the industry.

162.   By virtue of decades of continuous use, Blacksmith's Marks have become synonymous with high quality products that enables consumers to confidentiality associate Blacksmith and its products with its Marks. Blacksmith, including through its predecessors in interest, has built significant and valuable goodwill in its Marks.

163.   Blacksmith has expended substantial funds development and protection of its Marks and the associated goodwill that now accompanies those Marks.

164.   Blacksmith also owns the molds and the right to use and license the use of the molds of the proprietary tire designs.

165.   Blacksmith and OTR previously entered into the TLA, a worldwide trademark license in which Blacksmith authorized OTR to use the Licensed Marks

and the molds to make the Licensed Products manufactured and distributed under the Licensed Marks in exchange for a royalty payment. Under the TLA, the Licensed Marks had to be used in connection with the correlating Licensed Product (and mold), *as they are known in the industry*.

166.    Blacksmith and OTR subsequently entered into the Settlement Agreement and the Supply Agreement, which expressly superseded all prior agreement, including the TLA.

167.    OTR's right to use the molds for the Blacksmith's Products under the TLA was superseded by the Settlement Agreement and the Supply Agreement.

168.    OTR is using the mold for Blacksmith Products to procure Blacksmith Products from Blacksmith's manufacturer, but covering up, removing, or otherwise replating Blacksmith's Marks.

169.    Upon information and belief, OTR is telling, or has told, its distributors, customers, and other third parties that the Infringing Product is the Blacksmith Product (i.e., the "Outrigger").

170.    OTR, through its distributors or customers, is advertising the "OTR LIFTBOSS S/T OUTRIGGER R4" and further describes the "LIFTBOSS S/T (WAS OUTRIGGER)."

171.    OTR has used, and is using, in commerce, in connection with the sale, offer for sale, and advertising Blacksmith Products under its own trademarks and name, in violation of Section 43(a) of the Lanham Act (15 U.S.C. § 1125(a)).

172.    Upon information and belief, OTR has intentionally, knowingly and willfully passed off Blacksmith's Products as its own to cause consumer confusion, mistake, and/or deception.

173.    On information and belief, OTR is marketing and selling Blacksmith's Products under OTR's own brand without ordering such Products from Blacksmith to provide a false designation of origin and to mislead customers into thinking the tires are Blacksmith Products.

174.    On information and belief, OTR is engaging in express reverse passing off of Blacksmith's Products or implied reverse passing off of Blacksmith's Products damaging Blacksmith's goodwill and brand and allowing OTR to benefit from Blacksmith's efforts and costs to establish goodwill in the marketplace.

175.    On information and belief, in the alternative, OTR is also engaging in forward passing off by, for example, associating LIFTBOSS S/T branded tires with Blacksmith's OUTRIGGER branded tires.

176.    As a result of OTR's wrongful acts, Blacksmith has been damaged, and in the absence of relief from this Court will continue to be damaged by OTR's passing off of Blacksmith's Products as OTR products.

177.   By reason of the foregoing, Blacksmith is entitled to recover from OTR treble damages and reasonable attorney's fees, pursuant to 15 U.S.C. § 1117.

## COUNT IV – FALSE ADVERTISING
## (15 U.S.C. § 1125(a)(1)(B))

178.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

179.   Blacksmith and OTR compete in the market for AWP tires.

180.   Blacksmith is the owner of the Marks: OUTRIGGER, STABILIZER, and WEARMASTER, each of which is associated with a specific tire Product, including a unique tread design for each, that is recognizable in the industry.

181.   OTR, through its distributors or customers, is advertising the "OTR LIFTBOSS S/T OUTRIGGER R4" and further describes the "LIFTBOSS S/T (WAS OUTRIGGER)."

182.   Upon information and belief, OTR is telling, or has told, its distributors, customers, and other third parties that the Infringing Product is the Blacksmith Product (i.e., the "Outrigger").

183.   To the extent that OTR denies that its Infringing Product is in fact Blacksmith's Product to avoid liability under Blacksmith's reverse passing-off claim, then OTR is falsely advertising that its Infringing Product is the Outrigger (or "WAS OUTRIGGER").

184.   Similarly by advertising that the LIFTBOSS S/T tire "was" the "OUTRIGGER", OTR has falsely advertised that the OUTRIGGER is no longer offered for sale and has been replaced by the LIFTBOSS S/T. Such deception is literally false and poised to inject confusion into the marketplace.

185.   This deception is material because it affects the purchasing decisions of relevant consumers who ill inaccurately—and as a direct result of OTR's intentionally deceptive and misleading practices—perceive the Infringing Product as the well-known and well-regarded "Outrigger" produced by Blacksmith.

186.   The foregoing acts of OTR constitute false advertising in violation of 15 U.S.C. § 11125(a).

187.   OTR's false and misleading statements were made willfully, and with the specific intention of deceiving and misleading the public and causing competitive harm to Blacksmith.

188.   As a direct and proximate result of OTR's false and misleading advertising, Blacksmith has been and will continue to suffer damage, and in the absence of relief from this Court will continue to be damaged by OTR's false and misleading advertising of its Infringing Product as an "Outrigger."

189.   By reason of the foregoing, Blacksmith is entitled to recover from OTR treble damages and reasonable attorney's fees, pursuant to 15 U.S.C. § 1117.

## COUNT IV – FEDERAL TRADEMARK INFRINGEMENT
## (15 U.S.C. § 1114)

190.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

191.   Blacksmith is the owner of incontestable U.S. Federal Trademark Registration No. 2,288,934 for the mark OUTRIGGER. This mark registered on August 3, 1999, in connection with tires for construction, industrial, agricultural and off-road vehicles in International Class 012 and has been used in commerce since at least as early as January 1998.

192.   OTR, without consent from Blacksmith and beyond the scope of the Supply Agreement, used and is currently using, or is directing and/or authorizing use in commerce Blacksmith's OUTRIGGER trademark in connection with the sale, offering for sale, and advertising of construction tires, at least as shown on the website of OTR's sales partner: https://www.gallaghertire.com/otr-liftboss-s-t-outrigger-r4.html?srsltid=AfmBOopeYnL05D6Hrg33YD636gu2gGSz0feqt6NUz822C8UEz Xzj4Lk4 (Exhibit 21).

193.   Blacksmith has been damaged, and in the absence of relief from the Court, will continue to be damaged by OTR's use of Blacksmith's federally registered trademarks in connection with the sale of construction tires.

194.    OTR's use of the infringing marks in connection with the sale, offering for sale, and advertising of Defendant's goods is likely to cause confusion, mistake or deception with respect to the source of the goods and services and therefore constitutes trademark infringement under Section 32 of the Lanham Act (15 U.S.C. § 1114(1)(a)).

195.    By reason of the foregoing, Blacksmith is entitled to recover from OTR treble damages and reasonable attorney's fees, pursuant to 15 U.S.C. § 1117.

## COUNT IV – DECLARATORY JUDGMENT OF NO LICENSE OR OTHER RIGHT TO USE '910 PATENT OR '974 PATENT

196.    Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

197.    Pursuant to 28 U.S.C. § 2201 *et seq.*, an actual and justiciable controversy exists between Blacksmith and OTR, including because OTR contends that OTR has a right to practice, sell, use, and engage in conduct that would otherwise infringe upon Blacksmith's rights under the '910 Patent and the '974 Patent.

198.    OTR contends that it has a valid and subsisting license to the '910 Patent and the '974 Patent through the Intellectual Property Agreement.

199.    The Intellectual Property Agreement does not grant a license to the '910 Patent and the '974 Patent, but rather to U.S. Patent Application Number 29/643,323 expired on or about March 23, 2021.

200.  The Intellectual Property Agreement does not grant OTR any rights to any issuances, divisions, continuations, continuations-in-part, reissues, extensions, reexaminations, or renewals of the Shared AWP IP.

201.  Even though the '910 Patent resulted from the issuance of U.S. Patent Application Number 29/643,323, OTR has no rights in the '910 Patent.

202.  The '974 Patent claims priority to U.S. Patent Application Number 29/643,323, but was unsuccessful incorporating by reference the material disclosed by U.S. Patent Application Number 29/643,323. OTR has no rights in the '974 Patent.

203.  Further, the Intellectual Property Agreement inured to the benefit of the parties and to their respective successors and assigns.

204.  In or around March 2023, Blacksmith became the successor in interest and owner of all right, title and interest in and to the '910 Patent and the '974 Patent. The assignment included the right to seek remedies for any and all past, present, and future infringements.

205.  Therefore, Intellectual Property Agreement inures to the benefit of Blacksmith as the successor in interest to Mr. Taylor's intellectual property rights in the patents.

206.  The Settlement Agreement and the Supply Agreement each contain partial merger clauses.

71

207.   Blacksmith is not currently aware of any infringement of the '910 Patent and the '974 Patent by OTR as of the time of filing this Counterclaim, but as a result of OTR's contention in the Complaint that it has a valid and subsisting license to the '910 Patent and the '974 Patent through the Intellectual Property Agreement, an actual and justiciable controversy exists between Blacksmith and OTR.

208.   Blacksmith is entitled to a declaration from the Court that:

    a.  OTR has no license to the '910 Patent.

    b.  OTR has no license to the '974 Patent.

    c.  Blacksmith is not estopped from asserting its rights to the '910 Patent or the '974 Patent against OTR.

    d.  OTR acquired no rights to practice, sell, use, and/or engage in conduct that would infringe upon Blacksmith's rights under the '910 Patent or the '974 Patent.

209.   Blacksmith lacks a complete and adequate remedy at law concerning OTR's allegations as to the '910 Patent and the '974 Patent.

## COUNT IX – GEORGIA UNFAIR AND DECEPTIVE TRADE PRACTICES
### (Ga. Code § 10-1-373)

210.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

211.   OTR's activities described in this Complaint constitute willful deceptive trade practices, as defined in Section 10-1-373 of the Georgia Code. Blacksmith has been irreparably harmed and damaged, and is likely to continue to be irreparably harmed and damaged, absent an injunction by this Court, by OTR's deceptive trade practices.

212.   Because OTR's activities have been willful as alleged in this Complaint, Blacksmith is entitled to its attorneys' fees.

## COUNT X – GEORGIA COMMON LAW UNFAIR COMPETITION

213.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

214.   OTR's activities described in this Complaint constitute unfair acts that have damaged the legitimate business activities related to Blacksmith's manufacture, sale, offering for sale, advertising, using, and distributing to the public tires, including but not limited to the Accused Products. OTR's illegal activities have been in and affecting commerce, including among the purchasing public. Therefore, those activities by OTR constitute unfair and deceptive acts and practices in the State of Georgia pursuant to the common law of Georgia.

## COUNT XI – LITIGATION EXPENSES

215.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

216.   Under  Ga. Code § 13-6-11, Blacksmith may recover its reasonable attorney's fees and litigation expenses because OTR has acted in bad faith, have been overly litigious, and have caused Blacksmith unnecessary trouble and expense.

## COUNT I – PUNITIVE DAMAGES

217.   Blacksmith re-alleges and incorporates the preceding paragraphs by reference.

218.   Under  Ga. Code § 51-12-5.1, Blacksmith may recover its punitive damages because OTR's actions show specific intent to cause harm, willful misconduct, malice, fraud, wantonness, oppression, or an entire want of care, raising the presumption of conscious indifference to the consequences. Under a. Code § 51-12-5.1(f), because OTR acted with specific intent to cause harm, there is no cap on the amount of punitive damages the jury may award.

## PRAYER FOR RELIEF

WHEREFORE, Counterclaim-Plaintiff Blacksmith OTR, LLC respectfully prays for judgment against Counterclaim-Defendant OTR Engineered Solutions, Inc. as follows:

A.     Judgment in Blacksmith's favor and against Counterclaim-Defendant on all counts;

B.     Judgment in Blacksmith's favor that Counterclaim-Defendant breached the Settlement Agreement, including the Supply Agreement;

C.    An award to Blacksmith of the full amount of damages sustained as a result of Counterclaim-Defendant's breach of the Settlement Agreement, including the Supply Agreement;

D.    Judgment in Blacksmith's favor that Counterclaim-Defendant committed actual fraud against Blacksmith;

E.    An award to Blacksmith of the full amount of damages sustained as a result of Counterclaim-Defendant's fraud;

F.    An order under 15 U.S.C. § 1116 and/or other applicable law preliminarily and permanently enjoining Counterclaim-Defendant, including its officers, agents, servants, employees, attorneys, successors, assigns, and all those in privity or acting in concert or participation with Counterclaim-Defendant, from the following acts:

   1) from making any statement or representation that falsely designates or describes Counterclaim-Defendant as authorized, certified, or sponsored by, or associated with, Blacksmith or that is likely to confuse consumers as to the source, affiliation, or sponsorship of such products;

   2) from falsely and misleadingly advertising their Infringing Products, including claiming that they are "formerly Outrigger" or otherwise suggesting

3)  From infringing Blacksmith's trademark rights;

4)  from competing unfairly with Blacksmith; and

5)  from causing injury to the business reputation of Blacksmith.

G.    An order under 15 U.S.C. § 1116 and/or other applicable law preliminarily and permanently directing Counterclaim-Defendant, including its officers, agents, servants, employees, attorneys, successors, assigns, and all those in privity or acting in concert or participation with Counterclaim-Defendant, to perform the following remedial measures:

1)  removing from any and all websites, retail platforms, and social media used to advertise and sell Counterclaim-Defendant's products all uses of the Infringing Product, as described in the Complaint;

2)  issuing a recall notice to all purchasers of the Counterclaim-Defendant's in the United States and offering a full refund to any customers who purchased such Infringing Product;

3)  providing corrective advertising on all websites, retail platforms, and social media used to advertise and sell Counterclaim-Defendant's Infringing Product that such tires are not authorized, affiliate, sponsored or certified by Blacksmith;

4) under 15 U.S.C. § 1118 and/or other applicable law, destroying all inventory of Infringing Product, and certifying to Blacksmith that such destruction has occurred, including the number of units destroyed and the manner of their destruction; and

5) within thirty (30) days, providing to Blacksmith a sworn statement as to how it has complied with the Court's orders;

H.    An award of damages under 15 U.S.C. § 1117, and/or other applicable law, to Blacksmith against Counterclaim-Defendant resulting from its violation of Sections 32(1)(a), 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act (15 U.S.C. § 1125(a)(1)(A)-(B)), for federal trademark infringement, federal unfair competition and false designation of origin, and federal false advertising, respectively, in an amount to be fixed by the Court, which in its discretion it finds just, including:

1)    Disgorgement of all profits received by Counterclaim-Defendant from sales and revenues of any kind as a result of the actions complained of in this Complaint;

2)    all damages sustained by Blacksmith as a result of Counterclaim-Defendant's acts of false designation of origin, unfair competition, and false advertising, including damages resulting from losses sustained by Blacksmith and the equivalent of a

reasonable royalty, and any other damages sufficient to compensate Blacksmith for Counterclaim-Defendant's acts of trademark infringement, false designation of origin, unfair competition, and false advertising;

I.  A three-fold increase in damages under 15 U.S.C. § 1117 and/or other applicable law, for Counterclaim-Defendant's willful, wanton, and deliberate acts of trademark infringement, false designation of origin, unfair methods of competition, false advertising, and deceptive practices;

J.  That, because of the deliberate and willful actions of Counterclaim-Defendant, this action be designated an exceptional case, thereby entitling Blacksmith to an award of all reasonable attorneys' fees, costs, and disbursements incurred by Blacksmith as a result of this action, pursuant to 15 U.S.C. § 1117 and/or other applicable law, and that Blacksmith be awarded such relief;

K.  An award pursuant to 15 U.S.C. § 1117 and/or other applicable law of costs and pre- and post-judgment interest on Blacksmith's compensatory damages;

L.  A declaration from the Court that:

   1) OTR has no license to the '910 Patent.

78

2) OTR has no license to the '974 Patent.

3) Blacksmith is not estopped from asserting its rights to the '910 Patent or the '974 Patent against OTR.

4) OTR acquired no rights to practice, sell, use, and/or engage in conduct that would infringe upon Blacksmith's rights under the '910 Patent or the '974 Patent.

M.  Judgement awarded in Blacksmith's favor for damages as a result of Defendant's unfair and deceptive trade practices under Ga. Code § 10-1-373 and that Blacksmith be awarded its reasonable costs and attorneys' fees pursuant to Ga. Code § 10-1-373(b);

N.  Punitive damages under Ga. Code § 51-12-5.1;

O.  Judgment in Blacksmith's favor for damages resulting from Defendants' common law unfair competition under Georgia law;

P.  An order for Counterclaim-Defendant to pay to Blacksmith both the costs of this action and reasonable attorneys' fees incurred by it in prosecuting this action; and

Q.  That this Court award any and all relief not here enumerated that this Court deems just and equitable.

Dated: January 30, 2025                Respectfully submitted,

                                       /s/ Samuel Alexander Long, Jr.
                                       Samuel Alexander Long, Jr.

Samuel Alexander Long, Jr.
(*Admitted Pro Hac Vice*)
Christina Davidson Trimmer
(*Admitted Pro Hac Vice*)
Tom BenGera (*Admitted Pro Hac Vice*)
Spencer P. Mead
Georgia Bar No. 404464
SHUMAKER, LOOP & KENDRICK, LLP
101 South Tryon Street
Suite 2200
Charlotte, NC 28280
Tel:    704-375-0057
Fax:   704-332-1197
Email: along@shumaker.com
           ctrimmer@shumaker.com
           tbengera@shumaker.com
           smead@shumaker.com

Robert H. Smalley, III
Georgia Bar No. 653405
McCamy, Phillips, Tuggle & Fordham, LLP
Post Office Box 1105
Dalton, Georgia 30722-1105
Tel: (706) 278-4499
Fax: (706) 278-5002
Email: rsmalley@mccamylaw.com

*Counsel for Defendant*

## <u>LOCAL RULE 7.1(D) CERTIFICATION</u>

The undersigned counsel certifies that the foregoing document has been prepared with one of the font and point selections approved by the Court in LR 5.1(C).

This the 30th day of January, 2025.

/s/ Samuel Alexander, Long, Jr.

## CERTIFICATE OF SERVICE

I hereby certify that on January 30, 2025 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send email notifications of such filing to all counsel of record.

*/s/ Samuel Alexander Long, Jr.*